```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF MISSOURI
                         EASTERN DIVISION
```

UNITED STATES OF AMERICA,  )
                           )
          Plaintiff,       )
                           )
     v.                    )    No. 4:07 CR 286 JCH
                           )                    DDN
JOSE ROMER REYES-UGARTE,   )
                           )
          Defendant.       )

**ORDER AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before the court upon the pretrial motions of the parties which were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). An evidentiary hearing was held on June 11, 2007.

Before the court are defendant Jose Romer Reyes-Ugarte's motions to suppress evidence (Docs. 18 (oral), 22) and the government's oral motion for a determination of any suppression issues (Doc. 19).

From the evidence adduced at the evidentiary hearing, the undersigned makes the following findings of fact and conclusions of law:

**FACTS**

1. On April 16, 2007, beginning at 7:00 a.m., Phelps County, Missouri, Deputy Sheriff Carmelo Crivello was on duty in a marked police vehicle patrolling Interstate 44 in Phelps County. The officer was in uniform and carried a holstered sidearm.[1] At approximately 9:30 a.m. he observed a green Volkswagen passenger automobile violate two posted speed limit signs by not reducing its speed to the required 60 miles per hour. Using his own vehicle's speedometer, he determined that the car was traveling 70 miles per hour. For this reason, Deputy Crivello initiated a traffic stop of the car by turning on his emergency lights. The Volkswagen responded by stopping on the right shoulder of I-44. Although the rear window of the automobile was darkly tinted, the deputy

---

[1] At no time during the incident did deputy Crivello draw his weapon.

could see the basic body movement of the driver reach for the driver's side window visor.  Deputy Crivello got out of his police vehicle and walked up the passenger side of the car.  The front passenger window was lowered and Crivello told the driver, later identified as Jose Romer Reyes-Ugarte, that he had been speeding.  Reyes-Ugarte responded to the officer in English with an Hispanic accent that he did not know what the speed limit was.  Deputy Crivello then asked Reyes-Ugarte for his driver's license and vehicle registration.  Reyes-Ugarte complied, obtaining the registration paper from the center console.  The officer saw that the vehicle was registered to Reyes-Ugarte.

     2.   At that time, deputy Crivello asked Reyes-Ugarte where he was driving from.  Reyes-Ugarte said in English that he did not understand English.  So, Crivello spoke in fluent Spanish and restated the question.  Defendant responded in Spanish that he had been visiting his sister in Tulsa, Oklahoma, who was sick with a brain tumor.  Deputy Crivello gave Reyes-Ugarte an oral warning about speeding.

     3.   Crivello saw that Reyes-Ugarte's eyes were dilated, that his nose was running, and that he kept licking his lips.  From his training and experience, Deputy Crivello believed that these were indications of the use of a controlled substance.[2]  The officer asked Reyes-Ugarte whether there was anything illegal in the car.  Reyes-Ugarte responded in the negative and said the officer could search the car.  Deputy Crivello then asked Reyes-Ugarte to pop open the trunk lid, which he did.

     4.   Deputy Crivello went to the car's trunk and looked inside. He conducted a visual examination and saw only personal luggage.  He then asked Reyes-Ugarte to step out of the automobile and to sit in the

---

[2]Had the deputy not seen these indications of drug usage, he would have completed the usual final steps of such a traffic stop, by checking the driver's criminal history and by filling out a required statistical information sheet about the driver.

police vehicle.[3]  Reyes-Ugarge complied and sat in the front passenger seat.  He was not handcuffed.

    5.   When Reyes-Ugarte was situated in the police car, Deputy Crivello returned to the Volkswagen to continue his search.  He went to the driver's seat window visor, which he had seen Reyes-Ugarte move toward right after the car stopped.  From his training and experience, he knew that drivers sometimes stuff illegal materials in the liner of the vehicle near the visor.  He found that the cloth liner material near the visor was easily pulled away from the interior roof area; this disclosed a hidden space in which he saw and from which he seized a dollar bill folded into a "bindle"[4] which is frequently used to contain controlled substances.  He unfolded the bindle and observed a very small flake of white substance, about the size of a grain of salt.  Although he did not field test the substance, from his experience he believed the substance was cocaine.

    6.   Deputy Crivello returned to the police car and asked Reyes-Ugarte about the bindle and the substance inside it.  Reyes-Ugarte denied knowing anything about the item.  Deputy Crivello said that he did not believe him, because of the bindle's location, and the facts that he had seen the driver's eyes dilated, his nose running, and his continuing to lick his lips.  He then told Reyes-Ugarte that he would like him to follow him to the Sheriff's Office because they were then alongside a busy highway and because at the office he had the tools to do a better search.  Reyes-Ugarte agreed to do this and drove the Volkswagen behind the patrol car to the Sheriff's Office garage less than a mile away.

---

[3]With leave of court, defense counsel filed a post-hearing letter memorandum which commented on the Spanish words which the deputy testified he used to direct Reyes-Ugarte to move to the police vehicle. Doc. 26.  Defendant argues that these words were in the imperative, command form, as opposed to a precatory form, of the verb used.  The undersigned credits the argument that the officer used language that directed Reyes-Ugarte to move to the police car and did not leave it to him to decide whether or not he would comply with the officer's desire that he move.

[4]Def. Ex. A.

7.  At the deputy's direction, Reyes-Ugarte drove the Volkswagen inside the garage so that the car could be searched. Crivello offered Reyes-Ugarte the use of a restroom and a soda machine. The garage door was not closed. The deputy had Reyes-Ugarte sit in a folding chair near the open garage door and near where the Volkswagen was parked. Def. Ex. B.

8.  Deputy Crivello then examined the interior of the car. He soon observed that the factory-installed molding between the front doors and the dashboard was replaced by an after-market material black in color (different from the interior's color). Crivello removed the material easily, thereby exposing to view the usual void behind the dashboard near the steering column. When he used a flashlight to see into this void, Crivello's view was obstructed by a piece of sheet metal with a rough edge and black plastic "Bondo"-type material, which covered a secret compartment. He tried to remove the piece of sheet metal and the plastic material, but initially could not. Crivello told Reyes-Ugarte that he thought there was a hidden compartment in the car and that he could help himself by cooperating with an investigation.[5] Reyes-Ugarte did not indicate he would cooperate.

9.  Therefore, at approximately 10:39 a.m., Deputy Crivello had a trained canine unit officer, Deputy Sheriff Allan Studeny who was in the office at the time, get his trained drug dog "Caesar" to examine the Volkswagen automobile from the outside. All this time Reyes-Ugarte remained in the folding chair near the open garage door.

10. The canine officer and his trained dog walked twice around the outside of the automobile. Each time, the dog alerted to the area of the car near the discovered compartment, thereby indicating the presence of controlled substances. Again, Deputy Crivello gave Reyes-Ugarte an opportunity to cooperate, but he did not.

11. Then, Crivello forced open the compartment inside the dashboard and ultimately retrieved 12 duct-taped bricks of material from

---

[5]Deputy Crivello was giving Reyes-Ugarte an opportunity to cooperate with the authorities and perhaps identify his source of drugs, before the hidden compartment was dismantled and searched, all of which would be apparent to whomever Reyes-Ugarte was dealing with.

inside the dashboard near the odometer. Another deputy field tested the material and determined that it was cocaine.

    12. After the discovery of the cocaine, Deputy Crivello advised Reyes-Ugarte of his constitutional rights to remain silent and to counsel, by reading the rights to him. Reyes-Ugarte made no further statement to Deputy Crivello. At no time during the incident did Deputy Crivello tell Reyes-Ugarte that he was free to leave.

    13. Ultimately, Reyes-Ugarte was turned over to the Drug Enforcement Administration.

## **DISCUSSION**

    The Fourth Amendment to the Constitution protects an individual from unreasonable searches and seizures. U.S. Const. amend. IV. Stopping an automobile and detaining its occupants constitutes a Fourth Amendment seizure. Delaware v. Prouse, 440 U.S. 648, 653 (1979). Accordingly, the protections of the Fourth Amendment extend to roadside traffic stops. Id.

    Any traffic violation, however minor, provides probable cause for a traffic stop. United States v. Cortez-Palomino, 438 F.3d 910, 913 (8th Cir. 2006). There is no question then, that Deputy Crivello possessed the requisite probable cause to stop Reyes-Ugarte for speeding. See id. After an initial traffic violation, an officer may conduct a reasonable investigation. United States v. Bloomfield, 40 F.3d 910, 915 (8th Cir. 1994) (en banc). A reasonable investigation includes asking for the driver's license and vehicle registration, requesting the driver to sit in the patrol car, and inquiring about the driver's destination, route, and purpose. United States v. Munroe, 143 F.3d 1113, 1116 (8th Cir. 1998); id. That said, an investigative traffic stop should not last any longer than necessary to accomplish the purpose of the stop. Bloomfield, 40 F.3d at 916. Similarly, the officer's investigative methods should be the least intrusive means available for verifying or dispelling the officer's suspicions. Id.

    Once the purpose of the traffic stop has been completed, the officer may not further detain the driver unless the officer develops a reasonable suspicion of criminal activity during the course of the

initial investigation. See United States v. Jones, 269 F.3d 919, 925 (8th Cir. 2001). In other words, "[a]n officer must have a reasonable, articulable suspicion that a person is involved in criminal activity unrelated to the traffic violation before the officer may expand the scope of the traffic stop and continue to detain the person for additional investigation." United States v. Carrate, 122 F.3d 666, 668 (8th Cir. 1997).

### A. Reasonable Articulable Suspicion to Investigate Further

Reyes-Ugarte argues that Deputy Crivello lacked sufficient suspicion of criminal activity to detain him after Crivello verified his license and registration. The undersigned disagrees.

Reasonable articulable suspicion must be based on particularized, objective facts which, taken together with rational inferences from those facts, create a reasonable suspicion that a crime is being committed. Jones, 269 F.3d at 927. The court evaluates the presence of reasonable suspicion based on the totality of the circumstances and not each fact standing alone. Id. "A series of acts that appear innocent, when viewed separately, may warrant further investigation when viewed together." Bloomfield, 40 F.3d at 918.

The court also considers what certain conduct would suggest to experienced officers in the field, who have been trained in the observation of criminal activity. Id. A trained officer may properly infer from a set of circumstances that further inquiry is appropriate, even though the circumstances, standing alone, do not indicate illegal activity. Carrate, 122 F.3d at 669. However, an officer must be able to cite more than one or two generic factors, like nervousness or out-of-state plates, to support reasonable suspicion. See Bloomfield, 40 F.3d at 918 n.9. An officer's reasonable suspicion cannot be based on a hunch. Jones, 269 F.3d at 927.

In this case, Deputy Crivello was acting on more than a hunch. He observed that Reyes-Ugarte's eyes were dilated, that his nose was running, and that he kept licking his lips. Based on his experience and training, Crivello believed these symptoms betrayed drug-use. Considering these three facts together, along with the deputy's training

and experience, the undersigned concludes that Crivello had a reasonable articulable suspicion to believe a crime was being committed and to investigate further.

### B. Consent to Search the Car

Investigating further, Deputy Crivello asked Reyes-Ugarte if he could search the vehicle. The defendant agreed to the search. The undersigned concludes that the defendant's consent was freely and voluntarily given, allowing the deputy to legally search the car without a warrant.

When the police do not have a warrant, they may still search an area if they obtain the voluntary consent to the search. Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973). A court looks to the totality of the circumstances when deciding whether consent was freely and voluntarily given. Id. at 227. The Eighth Circuit has developed eleven factors for deciding questions of voluntariness. United States v. Chaidez, 906 F.2d 377, 381 (8th Cir. 1990). The first five factors are personal to the defendant, and consider: (1) his age, (2) his general intelligence and education, (3) whether he was intoxicated or impaired at the time, (4) whether he consented after being informed of his right to withhold consent, and (5) whether he was aware of his constitutional protections by virtue of previous arrests. Id. The next six factors relate to the surrounding circumstances, and consider whether the defendant: (1) was detained and questioned for a lengthy period, (2) was threatened, physically intimidated, or punished by the police, (3) was relying on promises or misrepresentations by the police, (4) was in custody or under arrest when consent was given, (5) was in a public or secluded place, or (6) objected to the search or stood by silently. Id.

There is little evidence of the defendant's age or intelligence in the record. And while Reyes-Ugarte betrayed certain signs of drug-use, he was still able to adequately respond to the deputy's questions, detailing the route and purpose of his trip. There is no indication Deputy Crivello informed Reyes-Ugarte of his right to withhold consent or that Reyes-Ugarte had been previously arrested. That said, a consent

form or an officer's warning of the right to refuse are not necessary to establish voluntary consent. See Carrate, 122 F.3d at 670.

Reyes-Ugarte consented to the search just after the deputy had finished his initial investigation. The consent was not predicated on any threats, intimidation, or promises by Deputy Crivello. In addition, Reyes-Ugarte was not under arrest at the time or located in a secluded place. See United States v. Urbina, 431 F.3d 305, 309 (8th Cir. 2005) (noting that the interior of a police patrol car on the shoulder of the highway during the day is not a secluded location). Finally, Reyes-Ugarte did not object while the officer performed the search.

In light of all the factors, the undersigned concludes that Reyes-Ugarte voluntarily and freely consented to the search of his car. See id. (noting that not every factor needs to weigh in favor of the police for a finding of voluntary consent).

### C. Probable Cause to Search the Car

Reyes-Ugarte argues that the officers did not have probable cause to search the vehicle. Again, the undersigned disagrees.

Probable cause to search exists when the known facts and circumstances are sufficient so that someone of reasonable prudence would believe that contraband or evidence of a crime will be found. Ornelas v. United States, 517 U.S. 690, 696 (1996). Police officers who have obtained probable cause to believe a vehicle contains contraband may search the vehicle without first obtaining a warrant. Chambers v. Maroney, 399 U.S. 42, 48 (1970).

The discovery of drugs in one part of a car creates probable cause for an officer to search the entire car. United States v. Casares-Cardenas, 14 F.3d 1283, 1287 (8th Cir. 1994). The search of the entire car may take place on the roadside or back at the station. Chambers, 399 U.S. at 52. Between the two, the Eighth Circuit believes the search at the station - rather than the roadside search - presents the "more palatable" alternative. Casares-Cardenas, 14 F.3d at 1287. In Casares-Cardenas, the police officer found a stash of drugs in the trunk of the car, after the defendant pulled over and consented to a search. Id. at 1285. Two months later, acting on an informant's tip, the police

searched the air-conditioning duct of the car and found more drugs.  Id. The Eighth Circuit held that the officers had probable cause to search the air-conditioning duct based on the initial drug find; the two-month delay did not make the subsequent search unreasonable.   Id. at 1287.

Like Casares-Cardenas, Reyes-Ugarte's consent produced an initial drug find.  After obtaining the defendant's consent, deputy Crivello found the "bindle" in the driver's side liner.  At this point, under Casares-Cardenas, the deputy had probable cause to search the entire vehicle back at the station.  The police lawfully seized the drugs within the car.

It is worth noting that the police would have also had probable cause to search the car by virtue of the dog sniff.  A dog sniff is not a search within the meaning of the Fourth Amendment.  Illinois v. Caballes, 543 U.S. 405, 409 (2005).  Police, therefore, do not need probable cause to perform a dog sniff.  United States v. Sanchez, 417 F.3d 971, 976 (8th Cir. 2005).  But once a dog alerts to the presence of drugs in a car or in luggage, the police have probable cause to believe drugs are present.  Id.  With probable cause established, the police can search the vehicle without a warrant under the previously described  automobile exception.  Chambers, 399 U.S. at 48.

Back at the station, Deputy Studeny and the drug dog walked twice around the vehicle.  Each time, the dog alerted to the presence of drugs near the dashboard.  The officers therefore had probable cause to search the area within the dashboard back at the station.  Under either Sanchez or Casares-Cardenas, the police lawfully seized the drugs within the car.

### D. Delay in Searching the Car

Between the time Deputy Crivello stopped Reyes-Ugarte for speeding and the time Deputy Studeny engaged the drug dog, a little over an hour elapsed.  Reyes-Ugarte argues that this was an unreasonable delay.  The undersigned disagrees.

An investigative stop becomes unlawful if it is prolonged beyond the time reasonably required to complete the purpose of the stop. Caballes, 543 U.S. at 407.  "Obviously, if an investigative stop

continues indefinitely, at some point it can no longer be justified as an investigative stop." United States v. Sharpe, 470 U.S. 675, 685 (1985). Simply put, a suspect cannot be unreasonably detained absent probable cause. Eubanks v. Lawson, 122 F.3d 639, 641 (8th Cir. 1997).

In determining whether a delay is excessive, a court considers the purpose of the stop and the time reasonably needed to accomplish that purpose. United States v. Maltais, 403 F.3d 550, 556 (8th Cir. 2005), cert. denied, 126 S. Ct. 1345 (2006). Some delay must be tolerated by the law; the Fourth Amendment does not require an officer lacking "probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." Adams v. Williams, 407 U.S. 143, 145 (1972). In judging delay, the inquiry focuses on whether the police diligently pursued the investigation. United States v. Place, 462 U.S. 696, 709 (1983).

Over an hour passed between the time Deputy Crivello stopped Reyes-Ugarte for speeding and the time Deputy Studeny engaged the drug dog. However, the one-hour period is not the relevant period. A suspect may not be unreasonably detained absent probable cause to arrest. In this case, deputy Crivello had probable cause to arrest Reyes-Ugarte after discovering the bindle in the driver's side of the vehicle. The discovery of the bindle occurred moments after Deputy Crivello had finished his initial investigation concerning the traffic stop. Accordingly, there was no unreasonable delay.

### E. Custodial Statements

The Fifth Amendment to the Constitution protects an individual from being compelled to be a witness against himself in a criminal case. U.S. Const. amend. V. To safeguard an individual's Fifth Amendment rights, a suspect in custody must be warned before being interrogated that he has the right to remain silent and that any statement he makes may be used against him. Miranda v. Arizona, 384 U.S. 436, 444 (1966). The safeguards described in Miranda only apply when a suspect is in custody. Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (per curiam).

Very few motorists would feel free to disobey an officer's command to pull over or to leave the scene without first being given permission.

Berkemer v. McCarty, 468 U.S. 420, 436 (1984). Nonetheless, persons temporarily detained during an ordinary traffic stop are not in custody for Miranda purposes – due to the temporary and public nature of a traffic stop. Id. at 439-40. A suspect is in custody for Miranda purposes only when he has been arrested or when his "freedom of action is curtailed to a degree associated with formal arrest." Id.

The Eighth Circuit has developed a series of factors for determining when an individual is in custody. United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990). These factors include: (1) whether the officer informed the suspect that the questioning was voluntary and the suspect was free to leave, (2) whether the suspect's freedom of movement was restrained during the questioning, (3) whether the suspect contacted the authorities or voluntarily agreed to answer the questions, (4) whether the officers employed strong-arm tactics or deceptive tactics during the questioning, (5) whether the atmosphere of the questioning was police-dominated, or (6) whether the officers placed the suspect under arrest at the end of the questioning. Id. In all cases, the relevant inquiry is how a reasonable person in the suspect's position would have understood the situation. Berkemer, 468 U.S. at 442. The officer's own plan or thought-process has no bearing on whether an individual was in custody at a particular time. Id.

In United States v. Martin, police officers pulled the defendant over for having an unilluminated brake light. 411 F.3d 998, 1000 (8th Cir. 2005). After issuing a citation, the officers continued their investigation, asking the defendant whether there were any drugs in the car. Id. After a drug dog alerted to the presence of drugs, the officers again asked the defendant about the presence of drugs in the car. Id. This time, the defendant admitted to having marijuana. Id. In a motion to suppress the statements, the defendant argued he was in custody after the officers issued the citation. Looking to Berkemer, the court ruled that the defendant was not in custody, since the defendant was never informed his detention would be anything but temporary and he was asked only a modest number of questions relating to the presence of drugs. Id. at 1002-03.

As in <u>Martin</u>, Deputy Crivello only asked a modest number of questions relating to the presence of drugs. The deputy also never indicated that the detention would be anything but temporary. Only one officer was present at the roadside stop, the officer never drew his weapon, and the stop was on a public highway during daylight hours. Deputy Crivello did not employ any strong-arm tactics and the presence of only one officer under the present circumstances does not indicate that the contact was police-dominated. Finally, Reyes-Ugarte was never handcuffed during or immediately after the road-side questioning. Taken as a whole, these factors indicate Reyes-Ugarte was not in custody at the time of questioning. Accordingly, the <u>Miranda</u> safeguards did not apply at the time the defendant responded to the officer's questions and the defendant's roadside statements may be used against him.

For these reasons,

**IT IS HEREBY RECOMMENDED** that the defendant's motions to suppress evidence and statements (Docs. 18 (oral), 22) be denied.

The parties are advised they have until July 12, 2007, to file written objections to this Order and Recommendation. The failure to file objections may result in a waiver of the right to appeal issues of fact.

## ORDER SETTING TRIAL DATE

As directed by the District Judge, this matter is set for a jury trial on the docket commencing August 13, 2007, at 9:00 a.m.

                                                                   /S/ David D. Noce
                                          **DAVID D. NOCE**
                                          **UNITED STATES MAGISTRATE JUDGE**

Signed on June 29, 2007.